```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

                                    )
LEAH LAFERRIERE,                    )
                                    )    Civil Action
          Plaintiffs,               )    06-5492
                                    )
v.                                  )
                                    )
ZURICH AMERICAN INSURANCE           )
COMPANY,                            )    Philadelphia, PA
                                    )    November 18, 2008
                                    )
          Defendant.                )
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN J. FULLAM
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          JAMES JOSEPH WALDENBERGER, ESQUIRE
                            Ochroch & Graber, PC
                            318 South 16th Street
                            Philadelphia, Pennsylvania

For the Defendant:          KEVAN FRANCIS HIRSCH, ESQUIRE
                            Kaplin Stewart Meloff Reiter &
                            Stein, Professional Corporation
                            Union Meeting Corporate Center
                            910 Harvest Drive, P.O. Box 3037
                            Blue Bell, Pennsylvania 19422-0765

Audio Operator:             Milahn Hull

Transcribed by:             DIANA DOMAN TRANSCRIBING
                            P.O. Box 129
                            Gibbsboro, New Jersey  08026-129
                            PHONE:  (856)435-7172
                            FAX:    (856) 435-7124
                            Email:  Dianadoman@Comcast.net

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

<u>I N D E X</u>

<u>ARGUMENT BY</u>

Mr. Hirsch                    3, 35
Mr. Waldenberger               14

1    (Call to the Order of the Court)

2         THE COURT:  Good morning.

3         MR. WALDENBERGER:  Good morning, Your Honor.

4         MR. HIRSCH:  Good morning, Your Honor.

5         THE COURT:  Be seated, please.  Sorry to hold things

6    up, but a good bit of the time was spent waiting for them to

7    figure out how to lower the barriers into the courthouse.

8         They were stuck in both directions.  This is argument

9    on defendant's motion for summary judgment in the Leah

10   Laferriere v. Zurich American.

11        Somebody wish to propose the motion?

12        MR. HIRSCH:  Your Honor, Kevan Hirsch for defendant

13   Zurich American Insurance Company.

14        THE COURT:  It's your motion, so you better start

15   talking.

16        MR. HIRSCH:  I better.  Okay.  I believe, Your Honor,

17   that we have three issues before us that relate to the --

18   first, the plaintiff's contention of lowball settlement tactics

19   leading to liability under the Bad Faith Statute, Section 8371.

20        Secondly, we have an issue relating to what conduct,

21   in the course of an arbitration, called for under the insurance

22   contract could lead to potential liability under that Bad Faith

23   Statute.

24        And, third, we have the issue of whether or not the

25   plaintiff has to show that there is some adverse impact, some

Hirsch - Argument                    Page 4

1   harm resulting from activities that are claimed to be in bad

2   faith.  And if the Court please, I would address them seriatim.

3          THE COURT:  Go right ahead.

4          MR. HIRSCH:  With respect to the question of

5   settlement and evaluations.  The case law, I believe, breaks

6   down into 3 types, which might permit liability under Section

7   8371.

8          When we have a question whether the defendant failed

9   to make a sufficient settlement offer so that a case had to go

10  to arbitration or trial.

11         They break down into three categories.  One, where

12  there is no offer, like Klinger.  Another where there's, if the

13  case is clearly worth the limits of liability and the insurer

14  will not offer them.  And the third is where a carrier makes

15  offers below their own evaluation and tries to stick with them.

16         In other words, to effectuate a situation where the

17  plaintiff can't accept the offer, and it's clearly

18  unreasonable.

19         And I don't think we have any of those here.

20         THE COURT:  Is there any obligation on the part of an

21  insurance company where the policy provides for arbitration, is

22  there any obligation to make offers to avoid arbitration?

23         MR. HIRSCH:  Well we have.  And I would say -- I

24  would say yes, if it's clearly a case where there is some

25  liability, such as this one.  There was no liability defense,

Hirsch - Argument                                    Page 5

1    so to speak.  In other words, Ms. Laferriere was rear-ended and

2    there was no question under the policy that she was an insured

3    and so on.

4          THE COURT:  Therefore, it's not your position, I take

5    it, that all the insurance company has to do, since there is a

6    provision for arbitration, is say to the client, okay, pursue

7    your remedies and we'll pay whatever the arbitrators award.

8          You have to make an offer of some kind.

9          MR. HIRSCH:  Yes.

10         THE COURT:  Okay.

11         MR. HIRSCH:  We agree with that proposition.  That

12   there is a good faith duty to try to resolve the claim.

13         THE COURT:  Okay.  What did you offer?

14         MR. HIRSCH:  The last offer that was made by Zurich

15   was $125,000.  It was first $100,000, then $125,000.  And that

16   was exclusive of the $50,000 that Leah Laferriere received from

17   the tortfeasor of 50,000, so that represented offers in the

18   total amount of compensation for her, 150 to $175,000.

19         THE COURT:  Okay.  So you think you did all right?

20         MR. HIRSCH:  Well we made a good faith effort.  And I

21   would look at some of the other evidence here beyond mere 20/20

22   hindsight looking at the award.  But I would look at some other

23   evidence, such as the evaluation of the case from the

24   plaintiff's perspective by her UIM counsel.

25         Mr. Goldberg testified that, in his view, that a

1    range of settlement for this case should have been from

2    $185,000 to $225,000.

3          And there were reasons why the parties -- that

4    counsel differed.  They had differences as to venue, they had

5    differences as to the admissibility of evidence, such as a

6    medical lien.  There were bases for these conclusions that were

7    made by counsel for Zurich, and the arguments that were made by

8    counsel for Ms. Laferriere.

9          But the one factor that seems to escape my opponents

10   here is that, in order to have a reasonable basis for your

11   activities, you do not have to be right.

12         THE COURT:  Well so you should prevail on the first

13   point, you made adequate offers.  What do you -- how do you

14   handle the second point?

15         MR. HIRSCH:  The second point, Your Honor, involves

16   after -- I think it is important to recognize that, from a

17   temporal standpoint, after the settlement negotiations were

18   concluded, and both sides had pretty much, you know, they've

19   come to an impasse.  Ms. Laferriere would not lower her demand

20   below $375,000.

21         Zurich did not think that was reasonable.  As her own

22   counsel testified and she testified, they felt that they should

23   take their chances at arbitration.  So now we move into the

24   realm of, what conduct in the course of an arbitration by

25   counsel should be considered to be within the realm of the Bad

Hirsch - Argument                                Page 7

1   Faith Statute.

2          And I think that we must consider, first and

3   foremost, that in the rather recent cases of Condio and

4   Zappile, which are discussed at length in the parties' briefs,

5   the Pennsylvania Superior Court has expressly recognized that

6   UIM arbitrations and UIM cases are now recognized as inherently

7   adversarial.

8          And while a duty of good faith remains between the

9   insured and insured -- the insurer, we must recognize up front

10  that this is akin to litigation.

11         Indeed now --

12         THE COURT:  Right but --

13         MR. HIRSCH:  -- we're not -- we have litigation.

14         THE COURT:  Does that mean that you can direct your

15  own medical expert to refuse to provide any information?

16         MR. HIRSCH:  Well I believe that he must consent.

17  The testimony was that, we preferred that he did not.  There

18  was never a threat.  Dr. Grossinger testified it was a cordial

19  conversation.  There was no suggestion, other than, we would

20  prefer it if you, as a testifying expert for our side, did not

21  consent to the use of your report.

22         THE COURT:  In effect, you said, please don't help

23  the other side.

24         MR. HIRSCH:  We did that in the context of an

25  arbitration proceeding where the Rules of Evidence applied.

1              THE COURT:  And then the arbitration proceeding --

2    and you also tried to keep his report out, right?

3              MR. HIRSCH:  We --

4              THE COURT:  You tried to keep out of evidence his

5    report.

6              MR. HIRSCH:  The initial objection was to the

7    plaintiff's use of Dr. Grossinger's report.  Yes.

8              THE COURT:  What was the basis?

9              MR. HIRSCH:  And then the objection was made to the

10   panel of arbitrators.

11             THE COURT:  What was the basis for the objection?

12             MR. HIRSCH:  That, in effect, one would be compelling

13   the testimony from an expert witness -- compelling a witness to

14   give opinion testimony.

15             Which ordinarily one cannot do.  It's sort of like

16   taking the deposition of the doctor in the malpractice case and

17   trying to get him to state his opinions.  Akin to that.

18             The objection was raised, the arbitration panel

19   agreed that consent would have to be given and --

20             THE COURT:  Consent by whom?

21             MR. HIRSCH:  Consent by Dr. Grossinger.

22             THE COURT:  Well, of course.

23             MR. HIRSCH:  And that, after the hearing, Mr. Meehan,

24   counsel for Zurich, called Dr. Grossinger and spoke to him

25   about it.  After the hearing, Mr. Goldberg called Dr.

1    Grossinger and spoke to him about it.

2          And Dr. Grossinger made the decision that he was not

3    going to consent.  At the same hearing --

4          THE COURT:  Did he testify before the arbitrators on

5    your behalf?

6          MR. HIRSCH:  He did not.  His opinion was ultimately

7    not admitted into evidence.  However, I would point out to the

8    Court that, during the course of this argument to the

9    arbitrators, Mr. Goldberg was given the opportunity, and

10   testified that he did tell the arbitrators exactly what the

11   report said.

12         And he was also --

13         THE COURT:  Therefore, what?  What's that got to do

14   with anything?

15         MR. HIRSCH:  Well it's got to do with the fact that

16   what happened here did not result in any harm to the

17   plaintiff's case.

18         THE COURT:  You mean, the arbitrators would regard as

19   evidence what the lawyer said that some witness had said?

20         MR. HIRSCH:  Not exactly.  But Mr. Goldberg testified

21   that he thought that was a terrific advantage for him, and

22   that, indeed, in making a motion to exclude all testimony

23   relating to the shoulder injury, that Mr. Meehan made a huge

24   strategic mistake.

25         He had argued both of those together.  Sort of like

1   you're making them -- you're --

2          THE COURT:  In other words, so that your obstructive

3   tactics actually helped the plaintiff?

4          MR. HIRSCH:  Well I would not call them obstructive,

5   Your Honor, I would call them in accordance with the Rules of

6   Evidence --

7          THE COURT:  That's how they character --

8          MR. HIRSCH:  -- and the arbitrators make a decision.

9          THE COURT:  -- that's how they would characterize

10  them, I'm assuming.

11         MR. HIRSCH:  I would.  I would agree that they're

12  going to characterize them as obstructive.  But I would like,

13  then, to return, if we might --

14         THE COURT:  You're so used to suggesting that what

15  they call obstructive tactics, if they're right that they are

16  obstructive tactics, that because they backfired, there was no

17  harm.

18         MR. HIRSCH:  Well what I'm suggesting is that

19  ultimately, however you characterize these activities, I would

20  prefer that they be characterized as an aggressive defense in

21  an arbitration proceeding, in accordance with the Rules of

22  Evidence.  No one's concealing everything.  The arbitrators are

23  presented with argument, and they make a decision.

24         At the same time, Mr. Goldberg was permitted to go --

25  or thought he was -- had leave to go to his own doctor and fill

1    the hole in his case.  And he does not dispute the fact that

2    there was a hole in his case, because he did not have a doctor

3    to say, with a reasonable degree of medical certainty, that Ms.

4    Laferriere's shoulder injury was caused by the accident.  And

5    then he subsequently obtained such an opinion, and it was

6    ultimately admitted before the arbitrators.

7         But when we proceed along this path about evidence

8    before -- who can make the evidentiary arguments, and whether

9    those would be characterized as obstructive, or not, do we not

10   start down the path of reexamining every decision made in this

11   type of proceeding on evidence and arguments that are made,

12   statements that are made by advocates in part of a tribunal

13   that's making the decision.

14        I think that a case that was decided before <u>Condio</u>

15   and <u>Zappile</u> by the Third Circuit has some relevance here.

16   Although it was not cited by the parties in their briefs.  And

17   that would be <u>West Virginia Realty v. Northern Insurance</u>, a

18   2003 case, in which the Third Circuit spoke of the question,

19   whether conduct during litigation should be considered within

20   the Bad Faith Statute.

21        Now in that case we had to -- had to do with the

22   discovery violation and so on.  But what the Third Circuit had

23   to say on litigation conduct was, under its analysis of the

24   case law, what we're -- the cases where bad faith claims were

25   permitted to proceed where the conduct is after litigation has

1    ensued.

2          All those cases involved, and I quote "Something

3    beyond a discovery violation suggesting that the conduct was

4    intended to evade the insurers' obligations under the

5    contract."

6          And the insurers' obligations --

7          THE COURT:  And you're citing that language in

8    support of your position?

9          MR. HIRSCH:  Because the insurers obligations here

10   are to either pay -- they are to pay what the insured is

11   legally entitled to recover as compensatory damages.

12         And if we cannot agree on the amount, then you go to

13   arbitration.  And the arbitration provisions are to be, it's

14   conducted in accordance with the Uniformed Arbitration Act, and

15   local rules of law as to arbitration procedure and evidence

16   will apply.

17         So what we are arguing about is, under the Rules of

18   Procedure and Evidence, is the defendant entitled to object to,

19   first, the use of the report, second, to supplemental medical

20   reports.  That's all being decided by arbitrators.

21         And now that that's all decided and the plaintiff has

22   received her result, which everyone thought was terrific, we

23   are now back here to reexamine whether or not Zurich had a

24   right to aggressively defend itself under the arbitration

25   provisions of this contract.

1    And, indeed, nowadays, a UIM case can go to Court.

2    In 2005, the Supreme Court of Pennsylvania decided that the

3    insurance commissioner could not mandate arbitration any

4    longer.  So now we're going to have cases in UIM -- for UIM

5    benefits that may actually go to Court.

6    So are we then going to go to reexamining everything

7    that happens in a trial later, because we got a large verdict

8    in the trial?

9    THE COURT:  Certainly.

10   MR. HIRSCH:  Or the whole pretrial procedure?  I

11   think it's akin to what Judge Waldman had to say in the <u>Slater</u>

12   <u>v. Liberty Mutual</u> case.

13   THE COURT:  What did he have to say?

14   MR. HIRSCH:  Where he said -- pardon me?

15   THE COURT:  What did he have to say?

16   MR. HIRSCH:  What he said was, and I quote.

17   "Section 8371 provides a remedy for bad faith conduct

18   by an insurer, in its capacity as an insurer.  And not as a

19   legal adversary in a lawsuit filed against it by an insured.

20   The Court's confident that the legislature did not contemplate

21   a potentially endless cycle of Section 8371 suits, each based

22   on alleged discovery abuses by the insurer in defending itself

23   in the prior suit."

24   Now the issue before Judge Waldman was a discovery

25   issue, again.  But here we have substantive objections to

1    evidence of procedure made, and an attempt to create from that

2    -- from those arguments and those motions made before the

3    arbitrators, a bad faith case.

4            THE COURT:  So you think you should get summary

5    judgement?

6            MR. HIRSCH:  I do, Your Honor.

7            THE COURT:  All right.  Let's hear if the other side

8    agrees.

9            MR. WALDENBERGER:  Good morning, Your Honor.  Jim

10   Waldenberger for Leah Laferriere.  I'm here with my co-counsel

11   Jonathan Cohen.

12           MR. COHEN:  Good morning, Your Honor.

13           MR. WALDENBERGER:  And, no, Your Honor, we do not

14   agree that summary judgment is appropriate.  Your Honor, you

15   listened to Mr. Hirsch for approximately 25 minutes.  And I

16   think what's telling there -- that was by my estimation --

17           THE COURT:  It's actually 18 minutes.

18           MR. WALDENBERGER:  Eighteen minutes.  What's telling

19   there is that there wasn't one mention of a claim note, or

20   statements of any of the Zurich representatives.  And that's

21   really what this case is about.

22           This case is about the evaluation of Leah

23   Laferriere's claim.  As Your Honor is surely aware, Section

24   8371 the Bad Faith Statute was put in place to prevent

25   insurance companies from being deceitful, or overbearing, or

1    taking advantage of people.

2          And what's important in this case is to understand

3    and appreciate the philosophy that is taken by Zurich, and

4    their approach to claims handling here.

5          Now there are a few statements that I'll explain

6    later, but I think are important, that are illustrative of what

7    the Zurich representatives, that includes Zurich's UIM counsel,

8    and how they handled the case.

9          Here's one.  "Ortho IME was silent on causation,

10   which was fine with us."  That's one statement.

11         Another one.  "Unfortunately, Grossinger also wades

12   in on additional future care."  Unfortunately.  "We should have

13   the neuro exam and report within 30 days.  That would put us

14   closer to the December holidays, which may be beneficial to

15   settlement negotiations."

16         And Your Honor my favorite is, "Use the IME as

17   leverage and argue lack of relationship with shoulder."

18         Statements like that by the Zurich representatives

19   are not indicative of bad faith.  What they show is a

20   philosophy, a mind set to find a reason not to pay the case,

21   and to lowball the case.

22         THE COURT:  Well they have an obligation to their

23   shareholders as well as to their insurers.

24         MR. WALDENBERGER:  Your Honor, correct, that is

25   correct.  And the Court in Condio held precisely that.

1    However, that's not the issue here.  What's interesting and

2    what's important about the Condio case, is Condio does

3    recognize that an un and under insured motorist case, when they

4    go to arbitration, there is a degree of an adversarial nature.

5            However, what the Condio court specifically says is

6    that the duty of good faith and fair dealing exists,

7    nonetheless.

8            It's just that the insurer doesn't have to sacrifice

9    its own interests --

10           THE COURT:  Right.

11           MR. WALDENBERGER: -- in favor of that of its insured.

12   Well in this case, Zurich was sacrificing Leah Laferriere's

13   interest.  And how that happened, Your Honor --

14           THE COURT:  In what respect?  What did they do to

15   sacrifice her interest?

16           MR. WALDENBERGER:  They performed an unreasonable

17   evaluation and investigation in the case.  And how that

18   happened was that there was zero evaluation of her shoulder

19   injury when it came to determining the value of her claim.

20           For example, probably the most telling evidence is

21   exhibit 1 to plaintiff's -- to our response to motion for

22   summary judgment, where in March of -- March 19th, 2004 Mark

23   Allard, who was the -- Your Honor, do you want me to stop while

24   you look at that?

25           THE COURT:  No, that's okay.

1          MR. WALDENBERGER:   Okay.

2          THE COURT:   I'm listening intently.

3          MR. WALDENBERGER:   In March of 2004, that is when

4     authority for $150,000 settlement was granted.

5              Now as you'll see in my brief, Mr. Allard testified

6     -- or Mr. Steinbock testified, that was the Zurich

7     representative, that, if he considered the shoulder, the case

8     is worth $225,000.

9              So let's do the math.  A hundred and fifty thousand

10    was what they reserved it for and granted authority for.  If

11    the shoulder's related, it's worth 225.  But they never offered

12    more than 125.

13             But more importantly than that, Your Honor, the day,

14    or I should -- I'm sorry to say that two weeks after the

15    $150,000 authority was granted to settle the case, Steinbock,

16    in exhibit 1, writes, "I have advised him that I would use the

17    IME as leverage and argue lack of relationship of the shoulder

18    in negotiations."

19             So what does that tell you?  It tells you that

20    they're not consider --

21          THE COURT:   Well, frankly, it doesn't tell me

22    anything.  Because the print is so small you can't read what

23    the heck it says.

24          MR. WALDENBERGER:   Understood, Your Honor.  But for

25    the record, I'm able to read it, and what the note says, is

1    that -- and actually under the middle note, March 19, 2004,

2    author, Ira Steinbock, category MCU, third paragraph.

3            "I have advised him that I would use the IME as

4    leverage and argue the lack of relationship of the shoulder in

5    negotiations."

6            And that is direct evidence that Zurich never

7    considered the shoulder, was never going to consider the

8    shoulder, and that statement doesn't stand alone.

9            THE COURT:  Well you didn't finish the reading.  I'm

10   getting better at looking at it.

11           "The demand is 400k, there is only 3k in lost wages,

12   and all meds have been paid."

13           MR. WALDENBERGER:  Yes.  And, Your Honor, for our

14   purposes, the remainder of that note does not subtract from the

15   fact that Zurich obviously was not evaluating or considering

16   the shoulder in the evaluation of the case.

17           THE COURT:  Right.

18           MR. WALDENBERGER:  Which is further supported by the

19   third party administrator with Sedgwick, who was handling part

20   of the administration of the claim here.  Their representative,

21   Mark Allard, testified on page 40 of his deposition that the

22   shoulder was not related.

23           When I took the deposition of Zurich's Ira Steinbock,

24   and I asked him, was the shoulder related?  Three highly,

25   highly, highly doubtful that the shoulder was related.

1          He also mentioned that Dr. Grossinger, the doctor

2      that Zurich hired to examine Ms. Laferriere, testified, or put

3      in his report that the shoulder was related, but his opinion

4      was, "discount it heavily," as Mr. Steinbock says on page 125

5      of his deposition.

6          Then Mr. Meehan, Zurich's UIM counsel, when I asked

7      him about, was the shoulder related?  What did you think about

8      the shoulder?  He mentioned, well we -- we just disregarded Dr.

9      Grossinger's opinion.  And why, Your Honor, that disregard of

10     the shoulder is unreasonable and lacked a reasonable basis, is

11     because all the evidence in the case showed that the shoulder

12     was related.

13         The accident was in December of 2000.  In -- two

14     weeks later, on December 28th, Leah goes to her family doctor

15     and she complains of shoulder stiffness.  She goes to

16     rehabilitation, and the rehab records, and all of this outlined

17     in the brief, between January 3rd 2001 and January 12th, 2001,

18     there's five complaints relating to the shoulder.

19         Putting aside the evidence that was already in the

20     file, the medical records showing the connection to the

21     shoulder, the connection to the shoulder to the car accident,

22     let's now discuss what Zurich found out while they were

23     investigating the case.

24         They sent Leah for an orthopedic IME in August of

25     2004 to see Dr. Bosacco.

1    Dr. Bosacco writes his report, there isn't a word in
2    there that says that the shoulder injuries aren't related to
3    the accident.
4        And Mr. Meehan --
5        THE COURT:  Well does he say the shoulder injuries
6    are related to the accident?  Or he just doesn't discuss that
7    issue?
8        MR. WALDENBERGER:  Doesn't discuss the issue.
9        THE COURT:  Thank you.
10       MR. WALDENBERGER:  And when Mr. Meehan, in his e-mail
11   to the Zurich representatives, which is at exhibit 6 to
12   plaintiff's response, and, again, apologizing for the small
13   writing, but what he puts in an e-mail.
14       "The Ortho IME, that's Dr. Bosacco, was silent on the
15   causation issue, which was fine with us."  Which was fine with
16   us.
17       The next thing that Zurich learned, Your Honor, was
18   when they sent Leah --
19       THE COURT:  Well, you mean, if they expressed
20   happiness at something that helps their cause, that's a sign of
21   bad faith?
22       MR. WALDENBERGER:  Yes.
23       THE COURT:  Oh.
24       MR. WALDENBERGER:  Because their cause, Your Honor,
25   is to serve -- their cause is --

1          THE COURT:  No, their -- their cause is not to give

2     you more than you're entitled to.

3          MR. WALDENBERGER:  Agreed, Your Honor.  I will not

4     stand here and tell you that the insurance company has to

5     accept everything that the insured says is facts without --

6     without performing an investigation.

7          THE COURT:  Okay.  What -- how were you damaged by

8     the insurance company's conduct?  What damages did you suffer?

9          MR. WALDENBERGER:  Your Honor, under law of

10    Pennsylvania, no proof of damages necessary.  I can present and

11    have calculated lost interest on the amount of the award, if

12    Zurich would have paid us earlier.

13         THE COURT:  So that, in your -- if the motion for

14    summary judgment is denied, and the case goes to the jury, and

15    the jury simply says, yes, there was bad faith, period.  They

16    don't award damages?

17         MR. WALDENBERGER:  Correct, Your Honor.

18         Bad faith --

19         THE COURT:  What's the point of suing?

20         MR. WALDENBERGER:  Bad faith is a remedial statute.

21    And --

22         THE COURT:  Remedial.  What remedy do you want,

23    that's what I'm trying to find out?

24         MR. WALDENBERGER:  Punitive damages and attorney's

25    fees as --

1          THE COURT:  Attorney's fees, for what?

2          MR. WALDENBERGER:  Attorney's fees for pursuing the

3    bad faith case, Your Honor.  Pursuant to the Willow Inn case,

4    which is a Third Circuit case.

5          THE COURT:  And what kind of punitive damages do you

6    think you're entitled to?

7          MR. WALDENBERGER:  Punitive damages for -- Your

8    Honor, I'm not exactly sure but -- what you're asking.  But --

9          THE COURT:  I'm trying to find out why we're

10   bothering with this case, if you don't know what you want.

11         MR. WALDENBERGER:  Your Honor, we want punitive

12   damages.

13         THE COURT:  Well how much?

14         MR. WALDENBERGER:  How much in punitive --

15         THE COURT:  What do you think you're entitled to?

16         MR. WALDENBERGER:  Your Honor, frankly, that's for

17   the jury to decide the amount of the punitive damages.  And the

18   issue here is that, the insurance company, Zurich, acted in bad

19   faith.  And pursuant to Section 8371, when an insurer acts in

20   bad faith, it is liable for punitive damages.

21          There is no requirement under the law that harm be

22   proven.  There's no Supreme Court -- Pennsylvania Supreme Court

23   case that holds that.  There's no Pennsylvania Superior Court

24   case that holds that.  There's no Third Circuit case that holds

25   that.

1    And as a matter of fact, the Court in <u>Birth Center</u>,

2    the Pennsylvania Superior Court noted that, the Bad Faith

3    Statute is a remedial statute.

4    And that --

5    THE COURT:  Of course it's remedial, all statutes are

6    remedial.  But I don't know what you're remedy is.  I'm trying

7    to find out.

8    MR. WALDENBERGER:  The remedy, Your Honor, is that

9    when an insurer acts in bad faith, the insurer is liable for

10   punitive damages.

11   THE COURT:  You want somebody to pull figures out of

12   the air as to what the punitive damages should be.  Who does

13   the pulling out of the air?

14   MR. WALDENBERGER:  The jury, Your Honor.  The jury

15   determine what the value of the bad faith is.  And the

16   purpose --

17   THE COURT:  They could award anywhere from fifty

18   cents to a million dollars.

19   MR. WALDENBERGER:  That's within the province of the

20   jury, Your Honor, that is correct.

21   THE COURT:  What -- what guideposts would they be

22   given, how would they be charged on the subject?

23   MR. WALDENBERGER:  Well what's, Your Honor, important

24   to remember --

25   THE COURT:  Your colleague wants you to read what

1    he's prompting you with.

2           MR. WALDENBERGER:  I've seen that.  What is important

3    to remember is that, deterrence is the issue.  And an insurance

4    company like Zurich, in a situation like this, cannot hamper

5    witnesses.  They cannot and should not contact their own IME

6    physician, who provides a favorable report, and when the

7    arbitration panel gives the UIM lawyer, the insurance lawyer

8    says -- one thing that Mr. Hirsch said was that the arbitration

9    panel agreed with Zurich's position, and that Leah Laferriere's

10   counsel could go seek Mr. Grossinger's consent.

11          That's not correct.  The arbitration panel didn't

12   agree with Zurich at all.  As a matter of fact, what actually

13   happened was that, as Mr. Meehan, Zurich's UIM counsel

14   testified:

15          "Unfortunately, the neutral arbitrator did not act on

16   the objection.  The panel decided that Mr. Goldberg should be

17   afforded additional time to determine if Dr. Grossinger would

18   consent to the use of the report."

19          So what did Mr. Meehan do, when he walked out of that

20   arbitration hearing?  He picked up the phone and he called Dr.

21   Grossinger, and Dr. Grossinger said he was told that, we prefer

22   that you not provide your consent and cooperation.

23          And Dr. Grossinger, as he testified, took that as

24   being advised not to cooperate.

25          Your Honor, that is the type of conduct that needs to

Waldenberger - Argument                    Page 25

1    be deterred, because Dr. Grossinger's report -- now Mr. Hirsch

2    goes a lot into the, this is litigation, almost like this is

3    gamesmanship.

4           Your Honor, this is not gamesmanship.  This not

5    litigation.  This is an insurance company that has an

6    obligation to evaluate Leah Laferriere's claim fairly and

7    objectively.  And it is not fair, and it is not objective when

8    insurance company's own doctor provides an opinion on

9    causation, and the insurance company does everything within its

10   power, including contacting the doctor and telling him not to

11   cooperate, after the arbitration panel give the UIM plaintiffs

12   lawyer permission to do so.

13          That is the type of conduct that needs to be

14   deterred.  That is the type of conduct that warrants punitive

15   damages.  And that's the type of conduct that the jury needs to

16   hear to understand what the value of the case is, and why

17   conduct like Zurich's conduct cannot be condoned and cannot be

18   repeated.

19          THE COURT:  You opponent says that you have three

20   issues you have to prove.  And one of them is that the

21   plaintiff was harmed by what the insurance company did.  You

22   disagree.

23          MR. WALDENBERGER:  I disagree, Your Honor.  And what

24   I would -- I disagree on the law.  The law does not require

25   that.  Under bad faith, the plaintiff has to prove two things.

1   Insurance company acts without reasonable basis and it had a

2   reckless disregard for its lack of reasonable basis.

3        There have been opportunities for the courts to

4   address that issue.  And in Terletsky, the PA Superior Court,

5   Zimmerman, PA Superior Court, Birth Center, Pennsylvania

6   Supreme Court, Klinger Third Circuit, none have ever added this

7   additional element of requiring harm.

8        And, Your Honor, if --

9        THE COURT:  Have they expressly said that the

10  plaintiff doesn't have to show harm?

11       MR. WALDENBERGER:  No.  They have not.  However, Your

12  Honor, what is instructive is that you take Hollock v. Erie,

13  which is the largest UIM bad faith verdict in Pennsylvania, 2.8

14  million dollars in punitive damages.  The arb award was paid in

15  that case.  We have Bonenberger, 275 -- Bonenberger v.

16  Nationwide, PA Superior Court, 275 in punitive damages.

17       That's an arb award in plaintiff's favor, too.  The

18  Klinger case, $300,000 in punitive damages.

19       THE COURT:  That argument is meaningless, since I

20  don't know what any of those -- what the fact of any of those

21  cases were and you don't either, apparently.

22       MR. WALDENBERGER:  Your Honor, I do know the facts of

23  the cases.  The most important fact with all those cases, is

24  that the plaintiff alleged bad faith in connection with the

25  handling of the UIM case.  And at the end of the day, the

1    arbitration award came in, and that in all of those cases

2    the plaintiff --

3              THE COURT:  Oh, well these are arbitrator's awards.

4              MR. WALDENBERGER:  I'm sorry, Your Honor.

5              THE COURT:  The arbitration award came in bigger than

6    what they offered, right?

7              MR. WALDENBERGER:  Correct.  Yes.

8              THE COURT:  How much bigger?

9              MR. WALDENBERGER:  The specific facts of each of the

10   individual cases regarding the numbers, Your Honor, I do not

11   know.  But the fact for which these cases are important here,

12   and this analysis, is that those cases did not say that

13   plaintiff wasn't harmed, there's no bad faith.

14             In that respect, these cases are very similar to the

15   present case, where we have an arbitration award.  If the rule

16   was that plaintiff needs to prove harm, and harm means some

17   element of financial loss, in any case when an insured goes

18   through an arbitration process and receives an award, there'd

19   be no potential bad faith.

20             And if that were the case, Your Honor, an insurance

21   company would never have the incentive to ever pay cases,

22   unless the arbitration award -- unless there's an arbitration

23   compelling them to do so.

24             And that is not the intention of the law.  It's not

25   the intention of the statute.  Specifically, the statute itself

1    doesn't even provide an element for compensatory damages.

2    Under 8371, if bad faith is proven, the plaintiff is entitled

3    to punitive damages, attorney's fees, and interest.

4              There is no --

5              THE COURT:  Interest on what?

6              MR. WALDENBERGER:  Interest on the amount of the

7    award and I believe it's --

8              THE COURT:  For what period?  In other words, first

9    of all, in this case, did the arbitrators award any prejudgment

10   interest, or not?

11             MR. WALDENBERGER:  No, Your Honor.  However, what we

12   have --

13             THE COURT:  And what is the time period between when

14   you got the 50,000, and made your UIM demand, and the time of

15   the arbitrators' hearing?

16             MR. WALDENBERGER:  The UIM demand was in February of

17   2004.  The arbitration hearing was in October of 2005.  What I

18   have prepared was actually a much more conservative estimate

19   than that, Your Honor.

20             And with Your Honor's permission, I will hand this

21   up.  I've already provided a copy to Mr. Hirsch this morning.

22   May I approach, Your Honor?

23             THE COURT:  Of course.  As long as it doesn't explode

24   when it gets here.

25             MR. WALDENBERGER:  Your Honor, what that document

Waldenberger - Argument                    Page 29

1    represents -- again, Your Honor, this is an alternative

2    argument.  My argument, number one, is harm is not required.

3    It's not required under the law, it's not required under the

4    statute.

5           However, if there is some element of harm required,

6    what this document shows is that I asked what type of interest

7    somebody would lose between January 4, 2005 and October 28,

8    2005.  And I'll give you the significance of those dates.

9           January 4, 2005 is the day that Zurich received Dr.

10   Grossinger's report relating the shoulder injury and all the

11   other injuries to the incident.  So I would think, at the

12   earliest possible time -- or I'd say the latest possible time,

13   Zurich was on notice as of January 4, 2005, when its own doctor

14   told them she was hurt, that this is a case that should have

15   been paid.

16          THE COURT:  Well just where did you get the $318,000

17   principal amount?

18          MR. WALDENBERGER:  $318,000 was the amount of the

19   arbitration -- arbitrators' award, after the deduction of the

20   50,000 for the third party driver.

21          THE COURT:  What was your demand before -- your final

22   demand before arbitration?

23          MR. WALDENBERGER:  $375,000.  So what this document

24   shows, Your Honor --

25          THE COURT:  No, your 375 included the 50 you already

1   got, or is this what you wanted over and above the 50?

2            MR. WALDENBERGER:  Additional.

3            THE COURT:  So you valued the case at over $400,000.

4            MR. WALDENBERGER:  Total, if you add in the UIM money

5   and the third party money, yes, Your Honor.  You are correct.

6            THE COURT:  Thank you.

7            MR. WALDENBERGER:  And what this document shows is

8   that, if Zurich would have paid the net value of the arb award

9   when they learned of -- when they had Dr. Grossinger's report,

10  if you -- if the loss is based on investment and equities,

11  you're looking at $21,000 in a loss of interest.

12           If it's loss based on bond and money market fund

13  investment, you're looking at $9,234.  Now, Your Honor, if harm

14  is required, if Your Honor feels, or holds that harm is

15  required, that is the harm that we can present.

16           But I can't emphasize enough that the law of

17  Pennsylvania is that no such harm is required.  And if harm

18  were required in bad faith cases, insurance companies would be

19  able to engage in lowball tactics and delay and never pay.

20           THE COURT:  Well now, just as a matter of curiosity.

21  My understanding, perhaps improper, is that in calculating

22  prejudgment interest or delay damages, you apply a set rate, do

23  you not?

24           MR. WALDENBERGER:  That is correct, Your Honor, but

25  that is not the figures we're referring to here.  That's a

1   different analysis.  What this number represents was that, if

2   Zurich paid the $318,000 when it should have paid it, that

3   money could have been in Leah Laferriere's back account and

4   then used in one of these two particular modes, and would have

5   netted --

6           THE COURT:  Sure.

7           MR. WALDENBERGER:  -- would have created the interest

8   that we see here.

9           THE COURT:  You wouldn't be making that argument if

10  the time period were a little later, though, would you?

11          Okay.

12          MR. WALDENBERGER:  So, Your Honor, moving from the

13  harm issue, if Your Honor is content that that issue is -- you

14  don't need to hear anything else on that.

15          THE COURT:  Right.

16          MR. WALDENBERGER:  What --

17          MR. HIRSCH:  From me, Your Honor?

18          THE COURT:  Oh, possibly.

19          MR. WALDENBERGER:  Going back to --

20          THE COURT:  Basically, I'm trying to find out what

21  you guys are fighting about, whether it's worth the effort and,

22  I don't think it is, frankly.

23          MR. WALDENBERGER:  Going back to the lack of

24  reasonable basis, Your Honor, and not having -- and not

25  evaluating the shoulder, what's important to know is, that

1     Zurich never had an opinion, medical opinion, refuting the

2     relationship of the shoulder, until October 20, 2005, which was

3     one week before th arbitration hearing.

4          This UIM case was opened on February 4, 2004.  And

5     between that time and the time of the arbitration, a year and a

6     half later, the only evidence that Zurich ever had was that

7     that shoulder was related to the accident.

8          THE COURT:  And a week before the hearing, they got

9     some evidence that confirmed that, or disagreed with it?

10         MR. WALDENBERGER:  A week before the arbitration

11    hearing they got a report from Dr. Bosacco, who was silent on

12    the issue before.  And his new report says that, she likely did

13    not have a shoulder injury related to the accident, because the

14    treatment records don't show an injury to the shoulder being

15    treated for after the accident.

16         Well why that is outrageous, Your Honor, is, number

17    one, the evidence that I related to you earlier regarding the

18    December and January medical records notes that showed she did

19    treatment on the shoulder.

20         Apparently Dr. Bosacco ignored that.  But what is

21    particularly interesting, is that that same mistake that Dr.

22    Bosacco says in October of 2005, that there's no complaints of

23    shoulder until May of 2001, that same mistake was made by Mr.

24    Meehan in filing a motion in limine presenting it to the

25    arbitration panel, where he says that there were no treatment

1    notes before May of 2001.

2         THE COURT:  So you should be suing Dr. Bosacco and

3    Mr. Meehan for bad faith.

4         MR. WALDENBERGER:  Your Honor, Mr. Meehan -- Zurich

5    is responsible for Mr. Meehan's conduct.  Mr. Meehan was

6    Zurich's representative, in this case.  Mr. Meehan was acting

7    on behalf of Zurich in this case, and the <u>Klinger</u> case

8    specifically holds that an insurance company can be responsible

9    for the acts taken by its lawyer handling a UIM case.

10        Which leads me to my next point.  And that is, Mr.

11   Hirsch went to great lengths to cite cases to you about how

12   litigation conduct is not bad faith.

13        What the common most distinguishing characteristic of

14   all of those cases, Your Honor, Mr. Hirsch specifically noted

15   the <u>Slater</u> case.  But there's the <u>Slater</u> case he cites, the

16   <u>O'Donnell</u> case, <u>International Surplus Lines</u> out of Wyoming, and

17   the <u>Sims</u> case out of Oklahoma.

18        What's the same about all those cases, is that the

19   discovery conduct in litigation -- the litigation conduct

20   that's at issue is the bad faith litigation conduct.  That

21   would be the same as if I was alleging that Mr. -- which I'm

22   not, if I was alleging Mr. Hirsch was engaging in some improper

23   acts, and I was trying to say that Zurich is responsible for

24   Mr. Hirsch's conduct.  And I'm not saying that.

25        And we're not saying that in this case.  We're saying

Waldenberger - Argument                    Page 34

1    that the conduct of Mr. Meehan, as Zurich's representative in

2    the under insured motorist proceeding, or under insured

3    motorist claims handling, was unreasonable and was in bad

4    faith.

5           He, along with Mr. Allard and Mr. Steinbock, did not

6    consider the shoulder.  And they recklessly disregarded the

7    fact that they didn't have any basis for the shoulder.

8           THE COURT:  Who were the arbitrators?  Do you

9    remember?  Does anybody know?

10          MR. WALDENBERGER:  Yes.  Plaintiff's arbitrator was

11   Michael Murphy.  The neutral arbitrator was, I believe George

12   Noel and the --

13          MR. HIRSCH:  That was our arbitrator.

14          MR. WALDENBERGER:  Zurich's arbitrator was George

15   Noel.  And the neutral was Gerald Montella.

16          MR. HIRSCH:  Right.  All three Delaware County

17   lawyers.

18          MR. WALDENBERGER:  Your Honor, Zurich had the

19   information all along to know that the shoulder injury was

20   related to the accident.  It was in the medical records.  Their

21   own doctor told them it was related.  And rather than do the

22   fair thing and the honest thing, and that is consider all of

23   that evidence and their own doctor's opinion, and properly

24   evaluate the case, which, incidentally, they internally valued

25   at 225, $225,000, again, but then never even offered that much,

1   was that, to do the fair thing would have been to consider all

2   of that evidence and pay this claim appropriately.  Make

3   appropriate offers.  And that's not what they did.

4        What they did is, they took every measure possible to

5   prevent Dr. Grossinger's opinion from being known by the UIM

6   counsel, from having it considered by the arbitration panel,

7   and for having his report known and fully appreciated and

8   understood by those individuals who have to consider the value

9   of the case.

10       You add onto that the fact that they did not have

11  support for their conclusions that the shoulder was not related

12  until a year and a half later, one week before the arbitration

13  proceeding, is nothing short than bad faith.  And, at the very

14  least, there's a genuine issue of fact that warrants the jury's

15  consideration as to whether or not Zurich acted reasonably and

16  appropriately in this case.

17            THE COURT:  Thank you.

18            MR. WALDENBERGER:  Thank you.

19            THE COURT:  You're persuaded, I assume?

20            MR. HIRSCH:  Well, Your Honor, what I heard was not

21  evidence that was so clear, direct, weighty and convincing as

22  to enable a clear conviction without hesitation about whether

23  or not the insurer acted in bad faith.

24            THE COURT:  Well who says you can't hesitate?

25            MR. HIRSCH:  The Third Circuit in J.C. Penny Life

1   Insurance Company v. Pilosi.

2           THE COURT:  What was the issue there?

3           MR. HIRSCH:  Pardon me?

4           THE COURT:  What was the issue there?

5           MR. HIRSCH:  The issue was that they were -- that

6   particular comment is directed to summary judgment on bad faith

7   claims.  And the fact that you must consider the burden of

8   proof that the plaintiff has at trial in considering a motion

9   for summary judgment.

10          THE COURT:  Who wrote the opinion?

11          MR. HIRSCH:  Judge Rosen, fourth panel of McKee,

12  Rosen and Weiss.

13          THE COURT:  Judge Rosen?

14          MR. HIRSCH:  Yes.

15          THE COURT:  Max Rosen?

16          MR. HIRSCH:  Yes.

17          THE COURT:  That was a long time ago, then.

18          MR. HIRSCH:  2004.

19          THE COURT:  That's a long time ago.

20          MR. HIRSCH:  Now, if I might, we focused for some

21  time upon little bits and snippets of evidence that were read

22  to the Court that were allegedly showing some sort of mind set

23  of denial.

24          But what we didn't focus upon, was just what is it

25  that Leah Laferriere was owed as of January 4, 2005.

1          THE COURT:  $380,000.

2          MR. HIRSCH:  That would be a little high, because it

3     was 318 they came back with.

4          THE COURT:  Oh.  Okay.

5          MR. HIRSCH:  Okay?

6          THE COURT:  318, okay.

7          MR. HIRSCH:  Because that's the question.  I mean,

8     the question in all of these cases on failure to settle is, is

9     there some clear benchmark to which the insurer's got to reach

10    in order -- is there some amount clearly owed that the insurer

11    failed to pay?  Okay?

12         And here we have a case that people evaluated quite

13    differently.  And, in fact, despite the insistence by Mr.

14    Waldenberger that zero dollars were allocated for the shoulder,

15    Mr. Meehan wrote to his clients on January 24th, 2005, it's

16    Exhibit C to our initial moving papers, and he says:

17         "As we discussed, we had evaluated this matter in a

18    range of $125,000 to $150,000, without taking the deduction of

19    the tortfeasor's 50,000 in insurance coverage into account.

20    However, this was before the additional shoulder surgery.  We

21    believe that this procedure probably adds another $25,000 to

22    the case.  As a result, we recommend valuing this matter in the

23    150 to $175,000 range, with a net exposure to Nationwide/Zurich

24    of 100 to $125,000.  Any offer within that range would be a

25    fair and reasonable offer to Ms. Laferriere."

1          Okay?  The shoulder was considered.

2          THE COURT:  And did you -- what offer did you make,

3    if you know.

4          MR. HIRSCH:  The offer -- both of those offers were

5    made.  First $100,000, then $125,000, by Mr. Meehan.  And it

6    was declined.

7          And, furthermore, after the $125,000 was offered,

8    there is evidence in the record that Mr. Meehan was told that

9    this case -- that the client wanted this case to go to

10   arbitration.  And that it was going to go.  And there was no

11   reason for Zurich to offer the amount that it had reserved,

12   which is a different thing at the beginning --

13         THE COURT:  Right.

14         MR. HIRSCH:  -- they reserved $150,000.  It wouldn't

15   be accepted.  Now how much -- what science is there to tell us

16   now where between $125,000 and $375,000 this case should come

17   out at?

18         THE COURT:  I think you ask the Kline & Specter firm.

19   They're knowledgeable in this deal.

20         MR. HIRSCH:  Yes.  So, overall, I would say, with

21   respect to the exhibit that was handed up to you, I would say

22   that, how does one calculate the amount of $318,000?

23         Where does that come from?  Only 20/20 hindsight,

24   which the Pennsylvania case law specifically has appealed, says

25   is not evidence of bad faith.

1          You can't use settlement offers and results as the

2    objective evaluation of a claim.  It could just as easily have

3    come in in favor of Zurich and been $100,000 instead of 125,000

4    -- or $318,000.

5          I would also point out that, when we're talking about

6    harm here to Ms. Laferriere, this exhibit, and I think that

7    Your Honor's drift might have been going towards sort of BMW v.

8    Gore and progeny, where punitive damages have to, as a

9    constitutional matter bear some relationship to --

10          THE COURT:  Right.

11          MR. HIRSCH:  -- the compensatory loss.  I would point

12    out here that, when we look at this exhibit and when we start

13    calculating what we're moving towards is a delay claim.  Now

14    although --

15          THE COURT:  Yes.

16          MR. HIRSCH:  -- we start this process on January 4,

17    2005, no one knows what she's owed, at that point, or anytime

18    later.  In fact, we're not even going to know what she might be

19    owed until Mary 24th, 2005, when the first arbitration hearing

20    was scheduled.

21          So now we're in the time period between May and

22    October of 2005.  We have two continuances.  One is to help

23    plaintiff seal up the hole in their case by getting consent

24    from Dr. Grossinger, or getting a supplemental report.  And

25    another's due to Mr. Meehan's objection about using a

1    supplemental report, and to give him a chance to get one

2    himself.

3            Because, although it was touted to you that Dr.

4    Bosacco changed his opinion and was so suspect, well Dr.

5    Hummer, plaintiff's physician, Dr. Hummer was the one who wrote

6    the note, and I quote:

7            "It is not clear to her or to me that the motor

8    vehicle accident was the cause of the shoulder pain, but the

9    onset was temporally related."

10           Now he wrote that note back in 2001, I believe, and

11   then, in 2005, he changed his opinion after getting a couple of

12   letters from the plaintiff's UIM lawyer, which I haven't seen,

13   because no one can look at those letters.

14           So he changed his opinion, too.

15           THE COURT:  You're suggesting those letters included

16   a check?

17           MR. HIRSCH:  I think one of them did.  But not enough

18   to make a difference.  That's not exactly what we were talking

19   about, but --

20           THE COURT:  Okay.

21           MR. HIRSCH:  -- I think Your Honor's correct.  So we

22   had two -- two doctors juxtaposed, who gave differing opinions,

23   if you believe that what Mr. Waldenberger has characterized as

24   a suspect opinion by Dr. Bosacco.  We have an equally suspect

25   opinion by Dr. Hummer.

1    And they're put before the arbitrators and they make

2    their award.  Then we're right back smack in the middle of

3    litigation.

4         That's what litigation is for.  It's not what bad

5    faith -- it's not bad faith conduct to conduct an aggressive

6    defense.  I mean, we get -- and, indeed, you know, there -- the

7    insurance company's obligations here, you know, Zurich's

8    obligations here -- Zurich's being sued, because they were

9    protecting, first, a $250,000 deductible by Nationwide.

10        And, second, Zurich.  So to say that Zurich's acting

11   solely in its own interest, is incorrect.

12        THE COURT:  Wait a minute, you lost me on that what

13   was --

14        MR. HIRSCH:  Okay.  This Nationwide -- the Nationwide

15   Mutual Insurance Company was the named insured.  Ms. Laferriere

16   was an employee of Nationwide Mutual Insurance Company.  And

17   that is how she was entitled to coverage.

18        THE COURT:  Well what's this 250 --

19        MR. HIRSCH:  The Nationwide policy has a $250,000

20   deductible in it.  So that Nationwide pays the first $250,000

21   on any UIM claim.  And Zurich only thereafter.  So in defending

22   this arbitration case, Zurich is not acting solely in its own

23   interest, but also in the interest of Nationwide.

24        Which is on the hook for the first $250,000 here.  So

25   this is not a case of solely self interest.

1      THE COURT:  So that, basically, the plaintiff, her

2   UIM claim was against her employer.

3      MR. HIRSCH:  That's correct.

4      THE COURT:  That's strange.

5      MR. HIRSCH:  For the first $250,000, it certainly

6   was.

7      THE COURT:  And how does that tie in with workers'

8   compensation laws?

9      MR. HIRSCH:  I think we're once removed, because of

10   the interposition of zurich there.

11      But, you know, we hear these sound bites, you know,

12   we hear the little sound bites, like that Dr. Bosacco's opinion

13   was fine with us.

14      Well it's fine with us, because in this context,

15   where she has to prove what she's legally entitled to as

16   compensatory damages, it's not Zurich's burden of proof to show

17   causation, it's her's.

18      And, you know, we come to another little vignette

19   here about how Mr. Meehan contacted Dr. Grossinger and said,

20   I'd prefer you don't give your consent.

21      Well are we to then be in a position here to be

22   subject to punitive damages because, in the contested

23   arbitration, our counsel contacted his expert witness?

24      THE COURT:  Just a matter of curiosity, was Mr.

25   Meehan an employee or a --

1      MR. HIRSCH:  Mr. Meehan was an associate of the law

2  firm of Rawle & Henderson.  And I would dispute highly Mr.

3  Waldenberger's characterization that in all instances Mr.

4  Meehan is considered to be the agent of the insured.

5      THE COURT:  Well regardless of that --

6      MR. HIRSCH:  Pardon me?

7      THE COURT:  -- have you suggested that Mr. Meehan

8  should contact his own liability insurer?

9      MR. HIRSCH:  No one has suggested that.  And Mr.

10  Meehan will be a witness in this case.

11      THE COURT:  Well --

12      MR. HIRSCH:  And -- but I would point out to the

13  Court that this is not -- that there is an independent

14  contractor issue here, too, on whether or not Mr. Meehan, you

15  know, that Zurich is totally responsible for it, all the

16  conduct.

17      One of the materials that plaintiff cited here was a

18  PaTLA brief on amicus curiae case.  But if you go to the

19  underlying case, which is <u>Harleysville Insurance v.</u>  --

20  <u>Ravendran v. Harleyville Insurance</u>, which is found at 2002

21  Westlaw 32516203.

22      You will see that the trial court opinion in that

23  case, which was subsequently affirmed, addresses this issue and

24  says that an attorney -- well as a general proposition can be

25  an agent, they can also be an independent contractor hired by

1    the insurance company.  And, therefore, any conduct by the

2    attorney cannot be imputed to the client.

3           So if there is some evidence that the Zurich

4    personnel is directing these particular things, and there's not

5    in all cases, such evidence.  But that I think is more --

6           THE COURT:  So that --

7           MR. HIRSCH:  -- of an issue for trial, because I

8    wanted to come back to --

9           THE COURT:  Your argument is that, all an insurance

10   company has to do to avoid bad faith claim, is to make sure

11   that all the bad faith was exercised by their hired attorney?

12          MR. HIRSCH:  Well that would be a little extreme,

13   Your Honor.  And I think that's exactly what the situation was

14   in Klinger where the insurance carriers tried to blame its

15   counsel for all these activities, and says we're not

16   responsible for him.

17          Okay?  I mean, that's not the case here.  But to

18   argue as a general proposition an agency theory that the

19   insurer can be liable for any conduct, I think is incorrect.

20          Your Honor asked about this issue, again, of punitive

21   damages and some of the facts of the cases involved.  Well, you

22   know, the case that stands out to me in this situation, we have

23   Hollock v. Erie, and that was a large punitive damage award.

24          But let's look at what the offer was.  The offer of

25   settlement was 29 times less than the arbitration award.  The

1   arbitrators awarded $865,000.  It was 29 times less.  It bore

2   no relationship --

3          THE COURT:  My primary school mathematics --

4          MR. HIRSCH:  I think it's about -- is it about

5   $30,000?

6          THE COURT:  -- is a little bit rusty.  But --

7          MR. HIRSCH:  I was looking in the opinion.

8          THE COURT:  I have trouble thinking of anything as

9   being so many times less.  You're saying it's one twenty-ninth

10  of?

11         MR. HIRSCH:  Yes.  I think it was something like --

12         THE COURT:  It's not 29 times less.

13         MR. HIRSCH:  -- $30,000.  And, you know, they had --

14  the insurance carrier in that case had in front of it, you

15  know, that was less than the medical expenses, than the unpaid

16  medical expenses.  They had wage loss projection of over

17  $100,000 in front of them.

18         It was -- it bore no reasonable relationship to the

19  claim at issue.  Okay?  And if we look at Hollock, we also need

20  to look at what happened when Hollock went from the Superior

21  Court to the Supreme Court.

22         And although --

23         THE COURT:  What did happen?

24         MR. HIRSCH:  -- and although it was dismissed as

25  improvident, Justice Cappy, joined by Justice Castille issued

1    an opinion in which, when one reads it, we're doing a little

2    Erie predictive analysis here.

3         When one reads that opinion, it comes across as

4    pretty clearly that, at least two justices, one's still

5    sitting, I believe that Section 8371 is not intended to reach

6    litigation conduct.

7         Okay.  We've cited that opinion in our brief and we

8    recommend it to -- because the trend here is to shrink the

9    application of the statute.  Indeed, in one last case, that was

10   not cited in the briefs, this is the Third Circuit case UPMC

11   Health System v. Metropolitan Life, it's found at 391 F.3d 497.

12        In that case --

13        THE COURT:  Well why isn't it in your brief, if it's

14   all that important?

15        MR. HIRSCH:  Well, you know, it was not all that

16   important, it's just that we're moving so far away from what

17   the statute, I thought, was intended to address.  And also

18   we're moving into the realm of a delay claim, which really

19   wasn't raised here, in response to this motion for summary

20   judgment.

21        I mean, we didn't have a situation -- we want to

22   address it.  I raised it initially, and I said that Mr.

23   Goldberg, you know, gave his opinion that this did not take an

24   inordinately amount -- long amount of time.

25        There were delays on both sides here.  And, you know,

1    that's just not sufficient.  So but in <u>UMPC Health System</u>

2    (sic), the Third Circuit was confronted with a case where

3    conduct was alleged where the insurance carrier was supposedly,

4    through a violation of the Unfair Insurances Practices Act,

5    trying to obtain additional premiums from the insured.  And the

6    question was raised whether this would not be bad faith conduct

7    under Section 8371.

8         The Third Circuit says that, you know, the activity

9    has to result from some denial of benefits to be within the Bad

10   Faith Statute.  Under the definitions in <u>Terletsky</u> and other

11   cases following.

12        And now other -- some cases have recognized that, you

13   know, the sort of the justice delayed, is justice denied

14   theory, and recognized that, in the long periods of time

15   elapsing because of undue conduct by the insurer --

16        THE COURT:  Well you denied him the difference

17   between what the arbitrators awarded and what your offer was,

18   right?

19        MR. HIRSCH:  If one could predict that, as of January

20   4th, 2005, or as of May 24th, 2005 --

21        THE COURT:  We can predict it easily now, what the

22   amount is.

23        MR. HIRSCH:  We certainly can.  Which is why it's

24   incompetent as evidence of bad faith standing alone.

25        THE COURT:  Okay.  Far be it from me to cut everybody

1   short, but I think I've heard all I want to hear.  I am totally

2   amazed at how much effort you gentlemen have put into this

3   case, just judging by the paperwork alone.

4            I will, of course, take it under advisement and

5   render a superb decision, which probably neither side will

6   like.

7            I will, however, give you the benefit of my current

8   thinking, which is that the one possible element that might

9   warrant a bad faith award is the trying to shut out the medical

10  opinion of the defendant's own doctor.

11           My suggestion is that the damages sustained by the

12  plaintiff are minimal, and that the punitive award, if any,

13  would be somewhat -- would be extremely moderate, would have to

14  be in order to past muster at all.

15           And I'm not sure that counsel fees or the

16  expenditure, based on the paperwork involved, whether the case

17  warranted that kind of attorney effort.

18           To make a long story short, what I'm going to suggest

19  is the following.  I'm going to recess for 10 minutes and

20  direct counsel to explore vigorously the possibility of

21  settling this case on some modest basis, which will avoid

22  further wasted effort on both sides.

23           MR. WALDENBERGER:  Your Honor, to the extent that

24  it's important to you, we have a mediation scheduled for this

25  Friday.

1      THE COURT:  Pardon?

2      MR. WALDENBERGER:  We have a mediation scheduled for

3   this Friday.

4      THE COURT:  Oh, before whom?

5      MR. WALDENBERGER:  Before Tom Rudder of ADR Options.

6      THE COURT:  Okay.  I will hold off, then, until after

7   I hear from you with the result of that.  Okay.  My suggestion

8   would be that both sides try to be more reasonable than you

9   have been up until now.  Okay?

10      Recess until further notice.

11    (Court adjourned)

12                      * * * * *

13              C E R T I F I C A T I O N

14   I, Josette Jones, court approved transcriber, certify that the

15   foregoing is a correct transcript from the official electronic

16   sound recording of the proceedings in the above-entitled

17   matter.

18

19   --------------------------------        -------------------

20   JOSETTE JONES                                DATE

21   DOMAN TRANSCRIBING